**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO. 3:22-CV-00278-RGJ-CHL**

**MICHAEL G.,**[1]                                                                                              **Plaintiff,**

**v.**

**COMMISSIONER OF SOCIAL SECURITY,**                                              **Defendant.**

**REPORT AND RECOMMENDATION**

Before the Court is the Complaint filed by Plaintiff, Michael G. ("Claimant"). Claimant

seeks judicial review of the final decision of the Commissioner of Social Security ("the

Commissioner"). (DN 1.) This case was referred to the undersigned Magistrate Judge to prepare

a report and recommendation. (DN 13.) Claimant and the Commissioner each filed a Fact and

Law Summary. (DNs 14, 16.) Therefore, this matter is ripe for review.

For the reasons set forth below, the undersigned recommends that the final decision of the

Commissioner be **AFFIRMED**.

**I.      FINDINGS OF FACT**

On or about August 28, 2019, Claimant filed an application for disability insurance benefits

("DIB") alleging disability beginning on August 22, 2017. (R. at 15, 93, 95-96, 110, 113, 205-

13.) On November 4, 2020, Administrative Law Judge ("ALJ") Steven Collins ("the ALJ")

conducted a hearing on Claimant's application. (*Id.* at 34-74.) During the hearing, Claimant

amended his alleged onset date to July 26, 2019, the day after an unfavorable decision by a

different ALJ on a prior claim for benefits. (*Id.* at 15, 42-43.) In a decision dated March 31, 2021,

the ALJ engaged in the five-step sequential evaluation process promulgated by the Commissioner

---

[1] Pursuant to General Order 23-02, the Plaintiff in this case is identified and referenced solely by first name and last initial.

to determine whether an individual is disabled.  (*Id.* at 12-33.)  In doing so, the ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.  (*Id.* at 17.)

2.   The claimant has not engaged in substantial gainful activity since July 26, 2017, the amended alleged onset date.  (*Id.* at 18.)

3.   The claimant has the following severe impairments: Benign Paroxysmal Positioning Vertigo; Vestibulo-Ocular Reflex ("VOR") dysfunction; Migraine headaches; and Partial seizure disorder.  (*Id.*)

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (*Id.* at 20.)

5.   [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: The claimant can occasionally climb ramps and stairs. The claimant must never climb ladders, ropes, or scaffolds. He should avoid all exposure to unprotected heights, moving mechanical parts, and driving a motor vehicle.  (*Id.* at 21.)

6.   The claimant is able to perform his past relevant work.  (*Id.* at 26.)

7.   The claimant . . . was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id.* at 26.)

8.   The claimant has at least a high school education.  (*Id.* at 27.)

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  (*Id.*)

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (*Id.*)

11.   The claimant has not been under a disability, as defined in the Social Security Act, from July 26, 2019[,] through the date of this decision.  (*Id.* at 28.)

Claimant subsequently requested an appeal to the Appeals Council, which denied his request for review on March 29, 2022.  (*Id.* at 1-6, 202-04.)  At that point, the ALJ's decision became the final decision of the Commissioner.  *See* 20 C.F.R. § 422.210(a) (2022); *see also* 42 U.S.C. § 405(h) (discussing finality of the Commissioner's decision).  Pursuant to 20 C.F.R. § 422.210(c), Claimant is presumed to have received that decision five days later.  20 C.F.R. § 422.210(c).  Accordingly, Claimant timely filed this action on May 24, 2022.  (DN 1.)

## II.    CONCLUSIONS OF LAW

The Social Security Act authorizes payments of DIB to persons with disabilities.  *See* 42 U.S.C. §§ 401-434.  An individual shall be considered "disabled" if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a) (2022).

### A.    Standard of Review

The Court may review the final decision of the Commissioner but that review is limited to whether the Commissioner's findings are supported by "substantial evidence" and whether the Commissioner applied the correct legal standards.  42 U.S.C. § 405(g); *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  "Substantial evidence" means "more than a mere scintilla"; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The Court must "affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would also have supported the opposite conclusion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013); *see Smith v. Sec'y of Health & Hum. Servs.*, 893 F.2d 106, 108 (6th Cir. 1989) (holding that

3

if the court determines the ALJ's decision is supported by substantial evidence, the court "may not even inquire whether the record could support a decision the other way"). However, "failure to follow agency rules and regulations" constitutes lack of substantial evidence, even where the Commissioner's findings can otherwise be justified by evidence in the record. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

### B.      Five-Step Sequential Evaluation Process for Evaluating Disability

The Commissioner has promulgated regulations that set forth a five-step sequential evaluation process that an ALJ must follow in evaluating whether an individual is disabled. 20 C.F.R. § 404.1520 (2022). In summary, the evaluation process proceeds as follows:

(1)     Is the claimant involved in substantial gainful activity? If the answer is "yes," the claimant is not disabled. If the answer is "no," proceed to the next step.

(2)     Does the claimant have a medically determinable impairment or combination of impairments that satisfies the duration requirement[2] and significantly limits his or her physical or mental ability to do basic work activities? If the answer is "no," the claimant is not disabled. If the answer is "yes," proceed to the next step.

(3)     Does the claimant have an impairment that meets or medically equals the criteria of a listed impairment within 20 C.F.R. Part 404, Subpart P, Appendix 1? If the answer is "yes," the claimant is disabled. If the answer is "no," proceed to the next step.

(4)     Does the claimant have the residual functional capacity ("RFC") to return to his or her past relevant work? If the answer is "yes," then the claimant is not disabled. If the answer is "no," proceed to the next step.

(5)     Does the claimant's RFC, age, education, and work experience allow him or her to make an adjustment to other work? If the answer is "yes," the claimant is not disabled. If the answer is "no," the claimant is disabled.

20 C.F.R. § 404.1520(a)(4).

---

[2] To be considered, an impairment must be expected to result in death or have lasted/be expected to last for a continuous period of at least twelve months. 20 C.F.R. § 404.1509 (2022).

The claimant bears the burden of proof with respect to steps one through four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  However, the burden shifts to the Commissioner at step five to prove that other work is available that the claimant is capable of performing.  *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008).  The claimant always retains the burden of proving lack of RFC.  *Id.*; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999).

### C.      Claimant's Contentions

Claimant argued that the ALJ erred in several ways.  He argued the ALJ erred in in failing to reopen his prior claim, in failing to adequately address Claimant's dizziness and balance issues in the ALJ's RFC analysis and determination, and in the ALJ's assessment of the opinions of the state agency medical consultants.  (DN 14, at PageID # 621-29.)  He claimed that these errors in the ALJ's determination of his RFC caused errors at later steps.  Specifically, Claimant argued that he could not actually perform his past relevant work due to his dizziness, the ALJ's determination regarding transferability of job skills was in error, and the ALJ's hypothetical to the vocational examiner ("VE") was insufficient for failing to address Claimant's dizziness.  (*Id.* at 627-30.)  The undersigned will address these arguments below.

### 1.      Failing to Reopen Prior Determination

At the outset of his decision, the ALJ noted that Claimant had filed a prior application for benefits that was denied in a decision by a different ALJ on July 25, 2019, ("the prior decision"). (R. at 15.)  The prior decision is part of the administrative record in this case.  (*Id.* at 75-92.)  The ALJ found "no basis upon which to reopen th[e] [prior] decision" and that the provisions of SSR

91-5p did not apply in this case.[3]  (*Id.* at 15.)  The ALJ concluded that "the pr[ior] decision [wa]s final and binding and the issue of disability [wa]s *res judicata*, involving the same parties and legal questions" and that he would "only consider the time period from July 25, 2019, the date of prior Administrative Law Judge decision, forward regarding the [C]laimant's alleged disability."  (*Id.*)  Claimant argued this was conclusion was in error because there was new and material evidence in the record that justified reopening the prior decision.  (DN 14, at PageID # 628.)

The applicable regulations provide that the Social Security Administration ("SSA") "may reopen a final determination or decision on [its] own initiative, or [a claimant] may ask that a final determination or decision to which [claimant] w[as] a party be reopened."  20 C.F.R. § 404.987(b) (2022).  The conditions for reopening a decision are addressed in separate regulations.  20 C.F.R. §§ 404.988, 404.989 (2022).  While Claimant argued he met the requirements for reopening the prior decision, as noted by the Commissioner, the ALJ's decision not to reopen the prior decision is generally not reviewable by this Court.  (DN 16, at PageID # 643-44.)  20 C.F.R. § 404.903(l) provides in relevant part, "Administrative actions that are not initial determinations . . . are not subject to judicial review. These actions include, but are not limited to, an action . . . (l) [d]enying [claimant's] request to reopen a determination or a decision."  20 C.F.R. § 404.903(l) (2022).  The Supreme Court has held that a decision by the SSA not to reopen a prior application, which can be made without a hearing, is not a "final decision . . . made after a hearing" within the meaning of 42 U.S.C. § 405(g) that grants the Court jurisdiction to review the SSA's decision.  *Califano v. Sanders*, 430 U.S. 99, 107-08 (1977); *see also Glazer v. Comm'r of Soc. Sec.*, 92 F. App'x 312, 314 (6th Cir. 2004) (citing *Califano*, 430 U.S. at 107-08) ("The [Supreme] Court held that [42

---

[3] SSR 91-5p provides guidelines on when a claimant can establish "good cause for missing the deadline to request review" and its stated purpose is "to avoid the improper application of res judicata or administrative finality when the evidence establishes that a claimant lacked the mental capacity to understand the procedures for requesting review." SSR 91-5p, 56 Fed. Reg. 29971, 29971 (July 1, 1991).

U.S.C. § 405(g)] could not be read to authorize judicial review of alleged abuses of agency discretion in refusing to reopen claims for social security benefits."). The only exception to this rule is where a plaintiff has established a colorable constitutional claim. *Califano*, 430 U.S. at 109; *Cottrell v. Sullivan*, 987 F.2d 342, 345 (6th Cir. 1992). "[A] colorable constitutional claim is established, and judicial review proper, when the claimant's mental capacity prevented him from understanding and pursuing further administrative remedies." *Newhouse v. Comm'r of Soc. Sec.*, 771 F. App'x 602, 605 (6th Cir. 2019) (citing *Parker v. Califano*, 644 F.2d 1199, 1203 (6th Cir. 1981)); *see also Anderson v. Comm'r of Soc. Sec.*, 195 F. App'x 366, 369 (6th Cir. 2006) (citing *Wills v. Sec'y Health & Hum. Servs.*, 802 F.2d 870, 873 (6th Cir. 1986)). The burden is on the claimant to demonstrate such an incapacity. *Newhouse*, 771 F. App'x at 605 (citing *Anderson*, 195 F. App'x 369-70). Here, Claimant has neither argued a colorable constitutional claim nor challenged the ALJ's conclusion that SSR 91-5p did not apply, a conclusion which dovetails with the finding necessary to demonstrate the type of colorable constitutional claim the Sixth Circuit has recognized. Under those circumstances, the undersigned finds that Claimant has not demonstrated that judicial review of the ALJ's decision not to reopen the prior decision is permitted.

In the alternative, the undersigned notes that Claimant amended his alleged onset date to the day after the prior administrative decision. Thus, the prior decision and the evidence contained therein was in no way determinative of the relevant period under review. The ALJ properly evaluated the evidence post-dating the prior decision and did not merely recite the prior decision's findings without additional analysis. *See Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 933 (6th Cir. 2018) (holding that in the case of successive application "[w]hen an individual seeks disability benefits for a distinct period of time, each application is entitled to review"). Because the ALJ

properly evaluated the new evidence applicable to the relevant period, the undersigned finds that Claimant has failed to demonstrate reversible error.

### 2.   RFC

An ALJ's RFC finding is the ALJ's ultimate determination of what a claimant can still do despite his or her physical and mental limitations.   20 C.F.R. §§ 404.1545(a)(1), 404.1546(c) (2022).   The ALJ bases his or her determination on all relevant evidence in the case record.   20 C.F.R. § 404.1545(a)(1)-(4).   Thus, in making his or her determination of a claimant's RFC, an ALJ must necessarily evaluate the persuasiveness of the medical opinions in the record and assess the claimant's subjective allegations.   20 C.F.R. §§ 404.1520c, 404.1529 (2022).   The undersigned will address Claimant's individual allegations of error regarding the ALJ's RFC determination separately below.

### a)   Balance/Dizziness

Claimant argued that the ALJ's RFC "evaluation with regard to dizziness and balance [wa]s not supported by the record as a whole."   (DN 14, at PageID # 621.)   He argued that the "ALJ parsed the evidence" related to those conditions, including misrepresenting the findings of otolaryngologist Dr. Jerry Lin, M.D. ("Dr. Lin").   (*Id.* at 626-27.)   He argued that an accurate assessment of the evidence of record related to his balance issues and dizziness should have resulted in the imposition of greater limitations in the ALJ's RFC.   (*Id.* at 621-27.)

As a starting point, "[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."   *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence

in the record for his decision to stand.").  However, the Court examines the record as a whole, including whatever evidence "in the record fairly detracts from its weight," without "resolv[ing] conflicts in evidence or decid[ing] questions of credibility" to determine whether an ALJ's decision is supported by substantial evidence.  *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 253 (6th Cir. 2016) (quoting in part *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) and citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012)).  Thus, where an ALJ has "improperly cherry picked evidence" instead of "more neutrally weighing the evidence," his or her decision is unlikely to be supported by substantial evidence.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009); *see Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) ("[S]ubstantiality of evidence evaluation does not permit a selective reading of the record.").

    Here, the evidence of record substantiates Claimant's complaints of dizziness and balance issues to an extent.  At the hearing, Claimant testified that he was frequently off balance during the day.  (R. at 52.)  He reported feeling like he was leaning even sitting down and wobbling when standing up.  (*Id.*)  He indicated that it had gotten worse recently referencing approximately April 2020.  (*Id.* at 52-53.)  He explained that when he gets up, he can feel himself being off balance. (*Id.* at 53.)  He testified that it was worse when he was sitting but when walking he needs to stop every five minutes before continuing to walk.  (*Id.* at 53-54.)  He testified that the balance issue started from his migraine headaches.  (*Id.* at 54.)  He testified that he has to sit in a chair to assist but that it does not help because once he gets up, he is dizzy again.  (*Id.* at 55.)  He said out of five days, he will experience symptoms four days a week and that it used to be more like three days out of seven before it got worse.  (*Id.* at 55-56.)  He also testified that the dizziness sometimes gets so bad that he falls and that he has had at least seven blackouts in the year before the hearing.  (*Id.*

at 58-60.)  Despite Claimant indicating that his wife could confirm, in her hearing testimony, his wife indicated that the last of her husband's blackout spells that occurred "a year or two ago."  (*Id.* at 63-64.)

The medical evidence of record that postdates his amended alleged onset date substantiates that Claimant complained of dizziness to his providers but also demonstrates gradual improvement with treatment.  On July 30, 2019, Claimant presented to his treating neurologist, Deepa Nidhiry, M.D. ("Dr. Nidhiry"), for his fifth Botox injection treatment for his migraine headaches.  (*Id.* at 314-15.)  Dr. Nidhiry noted that Claimant "complain[ed] of intermittent dizziness especially with physical exertion."  (*Id.* at 314.)  While Dr. Nidhiry made no objective findings during the visit, she assessed Claimant to have dizziness and referred Claimant to an audiologist for evaluation and treatment.  (*Id.* at 315.)

On August 9, 2019, Claimant saw his family doctor, Dorothy Tata-Oyekan, M.D. ("Dr. Tata-Oyekan"), for an annual exam.  (*Id.* at 321-22.)  Dr. Tata-Oyekan noted that Claimant had a history of traumatic brain injury related to a December 2013 motor vehicle accident that subsequently resulted in blackouts, seizures, and headaches, for the latter of which he was treating with a neurologist.  (*Id.* at 321.)  Her physical exam findings included that Claimant was in no distress; had normal range of motion in his neck; had a normal heart rate and regular rhythm; had normal effort and breath sounds in his chest; was alert and oriented to person, place and time; showed no cranial nerve defect, and was not diaphoretic.  (*Id.* at 322.)  There was no mention of dizziness or balance issues at this visit.  (*Id.* at 321-22.)

On August 22, 2019, Claimant visited the Heuser Hearing Institute ("HHI") to see an audiologist based on Dr. Nidhiry's referral.  (*Id.* at 378-81.)  The reason for his visit was listed as "dizziness, imbalance, aural fullness, [and] tinnitus" and the audiologist noted that Claimant

"report[ed] episodic vertigo and chronic lightheadedness and imbalance after" his 2013 motor vehicle accident as well as several falls in the last year. (*Id.* at 378.)  The audiologist put a "fall risk prevention plan in place" based on Claimant's reports of falling. (*Id.*)  The audiologist did a vestibular assessment. (*Id.*)  Claimant's results included classic bilateral response to the Dix-Hallpike maneuver, worse in the left; his roll test was positive for left canalithiasis; his vestibulo-ocular reflex ("VOR") function was abnormal; and his somatosensory organizational screening was within normal limits. (*Id.*)  The audiologist found that Claimant had bilateral, multicanal benign paroxysmal positioning vertigo ("BPPV") and the potential for a perilymph fistula. (*Id.*)  The audiologist recommended "[t]reatment of positioning vertigo," additional testing, and "[v]estibular and balance therapy as needed." (*Id.*)  The audiologist also wrote, "Multiple risk factors for dizziness including brain damage and whiplash [ ] might prevent full recovery via vestibular therapy alone." (*Id.*)  Claimant was also listed as being a fall risk. (*Id.* at 379.)

Claimant visited HHI again on September 23, 2019. (*Id.* at 375-78.)  His reported reason for his visit still included dizziness and imbalance. (*Id.* at 375.)  He reported aural pressure and headache after treatment to the audiologist, who noted that Claimant "continue[d] to experience movement and positionally provoked dizziness." (*Id.*)  The audiologist's vestibular assessment again documented classic response bilaterally to the Dix-Hallpike maneuver but this time the right was worse in the left, which the audiologist noted "indicat[ed] good response to initial treatment." (*Id.*)  His results again included a roll test that was positive for left canalithiasis and also an insignificant caloric weakness. (*Id.*)  The audiologist again found that Claimant had bilateral, multicanal BPPV and VOR dysfunction as well as the potential for a perilymph fistula. (*Id.*)  The audiologist again noted that risk factors might prevent a full recovery with only vestibular therapy. (*Id.*)  The audiologist again recommended "[t]reatment of positioning vertigo," additional testing,

and "[v]estibular and balance therapy as needed." (*Id.*) Claimant was again noted to be a fall risk. (*Id.* at 376.)

Claimant returned to HHI on October 7, 2019. (*Id.* at 372-74.) The listed reason for visit remained the same. (*Id.* at 372.) He "report[ed] less frequent episodes" but that "when symptoms [we]re present[,] the intensity [wa]s unchanged." (*Id.*) He reported no other ear or hearing issues. (*Id.*) The audiologist's vestibular assessment again documented classic response bilaterally to the Dix-Hallpike maneuver but "the intensity was greatly reduced." (*Id.*) The audiologist also conducted otoscopy, tympanometry, and behavioral testing. (*Id.*) Claimant's external auditory canals were clear bilaterally on otoscopy, "[t]ympanometry revealed normal pressure" though Claimant reported dizziness during testing of his right ear, and "[b]ehavioral results show[ed] normal hearing" with Claimant being able to recognize 96% of words in his right ear and 88% of words in his left. (*Id.*) The audiologist's impressions stated, "Progress continues as expected. Further fistula assessment is scheduled, patient was assigned positive for right ear upon tympanometry at today's appointment." (*Id.*) The audiologist again recommended "[t]reatment of positioning vertigo," additional testing, and "[v]estibular and balance therapy as needed." (*Id.*) Claimant was again listed as a fall risk. (*Id.* at 374.)

On October 29, 2019, Claimant again visited Dr. Nidhiry for his sixth Botox treatment. (*Id.* at 399-400.) He again reported "at least 70% improvement" in his migraines since starting Botox treatments but continued to "complain[ ] of intermittent dizziness especially with physical exertion." (*Id.* at 399.) Dr. Nidhiry noted that Claimant was "undergoing vestibular therapy at [HHI]." (*Id.*) She again made no objective findings but did list dizziness among Claimant's active problems. (*Id.* at 399-400.) Her assessment and plan only included references to Claimant's migraines. (*Id.* at 400.)

On November 7, 2019, Claimant returned to HHI. (*Id.* at 368-72.) The relevant notes largely overlap with his previous visit in October. He again "report[ed] less frequent episodes" but that "when symptoms [we]re present[,] the intensity [wa]s unchanged." (*Id.* at 368.) He reported no other ear or hearing issues. (*Id.*) The audiologist's vestibular assessment again documented classic response bilaterally to the Dix-Hallpike maneuver and the "the intensity was greatly reduced." (*Id.*) The audiologist also conducted immittance testing that showed normal pressure and "compliance with reflexes at expected levels bilaterally." (*Id.*) The audiologist attempted to do a functional assessment for a fistula and there was a "very low grade, less than 6 degrees per second, right, horizontal nystagmus with right ear stimulations" but Claimant got "very nauseated" and testing had to be stopped. (*Id.*) "There was no measurable change with left ear presentations." (*Id.*) Claimant's VOR function was abnormal, his roll test was positive on the left, he was noted as a fall risk, and he reported dizziness with pressure in his right ear during tympanometry testing. (*Id.* at 369-70.) He demonstrated positive Tullio phenomena on the right though during testing the examiner documented "spontaneous report of dizziness, nausea, had to lay [sic] down, appeared to be losing attention" and also noted "very little 'torso' sway." (*Id.* at 371.) The medical record explained that positive Tullio phenomenon can be caused by an inner ear fistula. (*Id.*) He also exhibit positive Hennebert Sign on the right, which likewise can be indicative of a fistula. (*Id.*) Claimant had "normal balance strategy." (*Id.* at 372.) The audiologist wrote as her impression, "Progress continues as expected. Further fistula assessment is scheduled." (*Id.* at 368.) The audiologist again recommended "[t]reatment of positioning vertigo," additional testing, and "[v]estibular and balance therapy as needed" but also documented a need for a neurocognitive evaluation. (*Id.* at 368.)

Claimant returned to HHI on November 26, 2019.  (*Id.* at 384-86.)  He reported "feeling more stable, as it relates to balance, since treatment was initiated but symptoms persist with no significant change in frequency or intensity of symptoms."  (*Id.* at 385.)  He again exhibited a classic response bilaterally to the Dix-Hallpike maneuver that was worse on the left and reported symptoms of dizziness during some testing including Tullio and Hennebert testing on which he also had a change in pupil dilation.  (*Id.*)  However, his roll test was negative this visit unlike prior ones.  (*Id.*)  The audiologist noted that "[p]osturography showed visual dependence and fall risks with movement outside of patient's center of gravity."  (*Id.*)  The audiologist's impressions were that Claimant's BBPV and VOR dysfunction "continue[d] to respond to intervention," Claimant still had the potential for a fistula, and vestibular therapy alone might not allow Claimant to fully recover, the latter of which had been documented before.  (*Id.*)  The audiologist recommended Claimant complete additional testing, "continue intervention," and schedule a functional assessment for a fistula and/or dehiscence with otoneurology.  (*Id.*)  The visit notes against listed Claimant as a fall risk.  (*Id.* at 386.)

Claimant again visited HHI on December 10, 2019.  (*Id.* at 383-84.)  During the vestibular assessment, Claimant's response to the Dix-Hallpike maneuver was only *mildly* positive to the left, and his roll test remained negative.  (*Id.* at 384.)  The audiologist's impression was that Claimant's positioning vertigo and VOR dysfunction was "continu[ing] to respond to intervention." (*Id.*)  The audiologist again noted that potential for Claimant to have a fistula and that vestibular therapy alone might not allow Claimant to fully recover.  (*Id.*)  As with Claimant's prior visit, the audiologist recommended Claimant complete additional testing, "continue intervention," and schedule a functional assessment for a fistula and/or dehiscence with otoneurology.  (*Id.*)

He returned to HHI on January 14, 2020.  (*Id.* at 382-83.)  He reported no change in his symptoms since his last visit or other changes in his hearing or health.  (*Id.* at 383.)  His response to the Dix-Hallpike maneuver was again only mildly positive bilaterally, and his roll test was again negative.  (*Id.*)  The audiologist's impression was that Claimant's positioning vertigo and VOR dysfunction was "[m]ostly resolved" though the potential for a fistula was again noted.  (*Id.*)  As with Claimant's prior visit, the audiologist recommended Claimant complete additional testing, "continue intervention," and schedule a functional assessment for a fistula and/or dehiscence with otoneurology.  (*Id.*)  This visit did not contain any notes about Claimant being a fall risk.  (*Id.* at 383-84.)

Claimant went for his seventh session of Botox treatment with Dr. Nidhiry on January 21, 2020.  (*Id.* at 396-98.)  Dr. Nidhiry again noted that Claimant reported a 70% improvement in his headaches since beginning Botox treatment.  (*Id.* at 396.)  She also noted his continued report of balance problems and that an ENT had scheduled him for left ear surgery.  (*Id.*)  The latter is curious because there is no corresponding visit to an ENT or information about any scheduled surgery in the administrative record.  Dr. Nidhiry again listed dizziness among Claimant's active problems but only assessed him to have migraines and included a plan regarding those migraines in her notes.  (*Id.* at 396-97.)  There were no objective findings related to that examination.  (*Id.* at 396-98.)

On February 13, 2020, Claimant visited Dr. Tata-Okeyan for his cholesterol.  (*Id.* at 425-31, 426.)  In her objective findings, Dr. Tata-Okeyan noted that Claimant was oriented to person, place, and time; was in no distress; had normal range of motion in his neck; had normal heart rate and regular rhythm; had normal effort and breath sounds in his chest; was not in any respiratory

distress; had no musculoskeletal deformity; had no cranial nerve defect; and was not diaphoretic. (*Id.* at 430.)  There is no mention of dizziness or balance issues at this visit.  (*Id.* at 425-31.)

On March 27, 2020, Claimant visited otolaryngologist Dr. Lin.  (*Id.* at 503-09.)  Dr. Lin noted that Claimant complained of dizziness that had been going on several months and did "not seem to be associated with fluctuations in hearing or fullness in the ears."  (*Id.* at 505.)  He noted that "[t]he episodes of dizziness are relatively short lived."  (*Id.*)  In his physical examination findings, Dr. Lin noted that Claimant's otoscopic examination was abnormal and Claimant had positive Hennebert sign though hearing sensitivity was within normal limits and the remainder of Claimant's physical exam was normal.  (*Id.* at 506.)  Dr. Lin assessed Claimant to have "[d]izziness and giddiness."  (*Id.* at 506.)  Dr. Lin noted that he needed to consider whether Claimant had a perilymphatic fistula or a superior semicircular canal dehiscence and to obtain Claimant's HHI records.  (*Id.*)  He also ordered a CT of Claimant's temporal bone.  (*Id.*)  Claimant's CT was initially scheduled for April 22, 2020, but he did not show.  (*Id.* at 514.)

On April 13, 2020, Claimant returned to Dr. Nidhiry for his eighth session of Botox.  (*Id.* at 393-95.)  Dr. Nidhiry again emphasized Claimant's reports of 70% improvement since starting Botox but also noted that Claimant now reported effect did not last for more than two months.  (*Id.* at 393.)  She again listed dizziness among Claimant's active problems but made no assessment or treatment plan regarding the same.  (*Id.* at 393-94.)  She also made no objective findings at this visit.  (*Id.*)

On May 8, 2020, Claimant again visited Dr. Tata-Okeyan reporting pain in his calf.  (*Id.* at 451-57, 452.)  In her objective findings, she noted that Claimant was not in distress, had normal range of motion in his neck, had a normal heart rate and regular rhythm, had normal effort and breath sounds in his chest, had no musculoskeletal deformity despite tenderness and edema in his

right calf, and was not diaphoretic.  (*Id.* at 456.)  She again did not reference balance or dizziness issues.  (*Id.* at 451-57.)

Claimant received his ninth session of Botox from Dr. Nidhiry on July 6, 2020.  (*Id.* at 390-92.)  She again listed dizziness among Claimant's active problems but made no objective findings at all and did not include any assessment or treatment plan related to dizziness.  (*Id.* at 390-91.)

On August 5, 2020, Claimant underwent a CT of his temporal bone as ordered by Dr. Lin.  (*Id.* at 515-16.)  The CT documented normal appearance of the temporal bone and "no evidence of superior semicircular canal or lateral semicircular canal dehiscence."  (*Id.* at 516.)

Claimant returned to Dr. Lin on August 24, 2020.  (*Id.* at 517-22.)  Dr. Lin noted that upon reviewing the CT results, "[t]here was no evidence of 3rd window malformation of the inner ear."  (*Id.* at 519.)  Dr. Lin noted that Claimant "continue[d] to have episodic dizziness without obvious triggers" and that Claimant's HHI records showed a positive fistula test.  (*Id.*)  Claimant was again assessed to have dizziness and giddiness and Dr. Lin again noted that he need to obtain Claimant's full HHI records and do additional fistula testing.  (*Id.* at 520.)  Dr. Lin stated that he would proceed with "MEE and PLF repair" if it was consistent with the HHI records.  (*Id.*)  This is the last medical visit in the record.

Both Claimant and the ALJ cited parts of the above summarized records that they deemed pertinent, often referencing the same information or to information in the same sections of the same records.  Neither misrepresented the content of the records themselves.[4]  The question for the undersigned is whether the ALJ's summation and RFC determination based on that summation

---

[4] Claimant argued that the ALJ misrepresented Dr. Lin's findings.  The undersigned finds that the ALJ did not do so.  The ALJ certainly did not emphasize that Dr. Lin was continuing to evaluate Claimant for the presence of a fistula but the absence of citation to that discussion did not invalidate the ALJ's summary.  Again, an ALJ need not cite to every piece of evidence in the record for his or her decision to be based upon substantial evidence.  *Simons*, 114 F. App'x at 733 (quoting *Craig*, 212 F.3d at 436); *Thacker*, 99 F. App'x at 665.

are supported by substantial evidence.  Here, the ALJ cited to at least a portion of every visit by Claimant to either his neurologist, audiologist, or otolaryngologist after his alleged amended onset date.  (R. at 22-23.)  The ALJ summarized that "the objective medical evidence d[id] not fully support the severity of limitations alleged by the [C]laimant."  (*Id.* at 24.)  The ALJ noted that "[C]laimant reported only episodic seizures and dizziness and his treatment records show his impairments improved with conservative, routine therapy and medications."  (*Id.*)  In addition to his visit-by-visit analysis of the salient features of Claimant's treatment history, the ALJ noted Claimant presented with "generally normal" physical examinations "showing full muscle strength, intact sensation, normal respiratory exams, and normal reflexes."  (*Id.*)  Specific to Claimant's BPPV and VOR dysfunction, he noted that Claimant's audiologist reported that conditions had "mostly resolved" and pointed to improvement in Claimant's test results in the audiologist's records.  (*Id.*)  He emphasized that Claimant's otolaryngology records showed normal hearing and generally normal physical exams.  (*Id.*)  Based on these records and his previous discussion, the ALJ concluded that the RFC he formulated "accommodate[d] [Claimant's] reported dizziness . . . to the extent that the record will permit."  (*Id.*)

Based on the undersigned's review of the evidence and the ALJ's decision, the undersigned cannot find that the ALJ's decision is unsupported by substantial evidence.  The ALJ relied on statements by Claimant's treating providers about improvement in his conditions and good response to treatment that corresponded with objective findings that decreased in severity over time.  Claimant is correct that his providers continued to document his complaints of dizziness, but the underlying conditions related to that dizziness appeared to have resolved or responded well to treatment as noted by the ALJ.  Claimant cited no provider who put any limitations on him related to his dizziness, let alone greater limitations than those imposed by the ALJ in his RFC

determination.  As courts have often noted, "[t]he substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.1986)).  Here, based on the undersigned's review of the entire record, the undersigned finds that the ALJ's decision falls within this zone of choice.  Claimant's argument amounts to nothing more than an attempt to point to other evidence in the record he claimed supported an opposite conclusion to that reached by the ALJ.  This is insufficient to disturb the ALJ's decision in this matter, and thus, the undersigned finds the ALJ's discussion of Claimant's balance and dizziness and corresponding RFC finding were supported by substantial evidence.

**b)**      **State Agency Medical Consultant's Opinions**

Claimant argued that the ALJ's treatment of and reliance on the state agency medical consultants' opinions was in error because their opinions were not based on all the evidence in the record.  (DN 14, at PageID # 628-29.)  Pursuant to the applicable regulations, ALJs must consider the medical findings of state agency medical and psychological consultants because they "are highly qualified and experts in Social Security disability evaluation."  20 C.F.R. § 404.1513a(b)(1) (2022).  There will always be a gap between the time the agency experts review the record and give their opinion and the time the hearing decision is issued.  *See Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009).  "Absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand."  *Id.*; *see also McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009).  Here, the ALJ thoroughly considered the evidence postdating the decisions by the state agency medical consultants; thus, the undersigned can find no error in the ALJ's opinion.

Claimant also argued that "there is no narrative with citations to the record showing the specific medical findings on dizziness are consistent with and support[ ] the state agency opinions." (DN 14, at PageID # 629 (citing 20 C.F.R. § 416.920c(b)(2)).)   To the extent this is merely a restatement of Claimant's argument rejected above regarding the ALJ's assessment of Claimant's dizziness and balance issues, the undersigned rejects the argument for the same reason stated above: the ALJ's evaluation was supported by substantial evidence.   To the extent Claimant intended this as an argument that the ALJ's discussion was procedurally deficient under the new regulations for evaluating medical opinion evidence, the undersigned finds no error in the ALJ's discussion.   Pursuant to 20 C.F.R. § 404.1520c, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" in the record regardless of its source.[5]   20 C.F.R. § 404.1520c(a).   Instead, an ALJ will evaluate the "persuasiveness" of a medical opinion by reference to the five factors listed in the regulation: supportability, consistency, relationship with the claimant, specialization, and other factors.   20 C.F.R. § 404.1520c(a), (c).   The regulations provide that the two most important factors are supportability and consistency and that an ALJ is required to "explain how [he or she] considered the supportability and consistency factors for a medical source's medical opinions."   20 C.F.R. § 404.1520c(a), (b)(2).   An ALJ is not required to explicitly discuss how he or she weighed the other regulatory factors of relationship with the claimant, specialization, and other factors.   20 C.F.R. § 404.1520c(b)(1)-(2).

The Sixth Circuit has not elucidated a specific standard to determine whether an ALJ sufficiently complied with the requirement to "articulate how [he or she] considered the medical opinions" and "explain how [he or she] considered the supportability and consistency factors"

---

[5] This language indicates that the new regulation has done away with the controlling weight and other old rules regarding the weight to be ascribed to medical opinions.  20 C.F.R. § 404.1527(c)(2) (2022).

under the new regulations.  20 C.F.R. § 404.1520c(b).  *But see Deaner v. Comm'r of Soc. Sec.*, 840 F. App'x 813, 822 (6th Cir. 2020) (White, J. dissenting) (applying the new regulations and finding that "[t]he ALJ did not clearly analyze the supportability and consistency of the state consultants' assessments, as compared to other evidence in the record which supported [the plaintiff]'s claims").  However, district courts applying the new regulations within this circuit consistently apply the articulation requirement literally.  *See, e.g.*, *Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 909 (E.D. Mich. 2021) ("The administrative adjudicator has the obligation in the first instance to show his or her work, i.e., to explain in detail *how the factors actually were applied* in each case, to each medical source. Resorting to boilerplate language to support a finding of unpersuasiveness does not satisfy that obligation." (emphasis in original)); *White v. Comm'r of Soc. Sec.*, No. 1:20-CV-00588-JDG, 2021 WL 858662, at *21 (N.D. Ohio Mar. 8, 2021) ("Although the new standards are less stringent in their requirements for the treatment of medical opinions, they still require that the ALJ provide a coherent explanation of [her] reasoning."); *Lester v. Saul*, No. 5:20-CV-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom. Lester v. Comm'r of Soc. Sec.*, No. 5:20-CV-1364, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021) (finding that "the [new] regulations do require that the ALJ clearly explain his consideration of the opinions and identify the evidence supporting his conclusions").

Here, the ALJ noted that the opinions of the state agency medical consultants were consistent with one another and with the prior decision's RFC assessment.  (R. at 25.)  He also noted that the conclusions in those decisions were supported by "claimant's normal physical examinations showing full muscle strength, intact sensation, normal range of motion, and normal reflexes with no ataxia and no gait abnormalities," citing supporting medical records, and that

Claimant's "records show[ed] normal hearing sensitivity and normal hearing behaviors and reported only short-lived episodes of dizziness." (*Id.* (citing *id.* at 332, 339, 360, 430, 506, 509).) While it is clear Claimant disagrees with this analysis, the undersigned already found above that the ALJ's discussion of Claimant's dizziness and balance issues was supported by substantial evidence. Given that finding and given the ALJ's stated reasons for the persuasiveness he placed on the state agency medical consultant's opinions, the undersigned finds the ALJ's discussion was procedurally sufficient and Claimant's argument is without merit.

### c) **Substantial Evidence Generally**

Based on the conclusions above, the undersigned finds that the ALJ's RFC determination was supported by substantial evidence. His analysis more than surpasses the threshold for substantial evidence, which is "not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) ("Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations. And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."). Claimant did nothing more than point to other evidence in the record he claimed supported an opposite conclusion to that reached by the ALJ. However, this Court's role is not to second-guess the ALJ's conclusions. *Gayheart*, 710 F.3d at 374; *Smith*, 893 F.2d at 108; *Ulman,* 693 F.3d at 714.

### 2. **Step Four**

Claimant argued that the ALJ's determination that he could return to his past relevant work was in error because his "dizziness and risk of falling in a kitchen is a safety hazard." (DN 14, at PageID # 629.) At step four, the ALJ must determine whether a claimant can return to his or her

past relevant work.  20 C.F.R. § 404.1520(f).  Past relevant work is "work that [the claimant] ha[s] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it."  20 C.F.R. § 404.1560(b)(1) (2022).  When evaluating whether a claimant can perform past relevant work, the ALJ will examine the claimant's RFC and compare it to the physical and mental demands of the claimant's past work.  20 C.F.R. § 404.1520(f).  The relevant inquiry is whether the claimant can return to his or her past type of work rather than just his or her past job.  *Studaway v. Sec'y of Health & Hum. Servs.*, 815 F.2d 1074, 1076 (6th Cir. 1987).  "The regulations permit an ALJ to use the services of a vocational expert at step four to determine whether a claimant can do his past relevant work . . . ."  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007).  Specifically,

> a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.

20 C.F.R. § 404.1560(b)(2).  If the claimant can return to his or her past relevant work, he or she will not be found disabled.  20 C.F.R. §§ 404.1520(f), 404.1560(b)(3).  Here, the ALJ relied on the testimony of the VE in response to a hypothetical that mirrored the ALJ's RFC determination to find that Claimant could return to his past relevant work.  As the undersigned found above that the ALJ's RFC determination was supported by substantial evidence, the undersigned can find no error in the ALJ's step four determination.  Claimant's argument is premised on a need for greater limitations related to balance and dizziness than those imposed by the ALJ; the undersigned has already rejected this argument.

Additionally, the undersigned finds that to the extent there was any error at step four, the error was harmless because the ALJ proceeded to step five and determined that there were other

jobs in the national economy that Claimant was capable of performing given his RFC.  *See Griffin v. Berryhill*, No. 3:18-CV-00680-RSE, 2019 WL 4044026, at *7 (W.D. Ky. Aug. 27, 2019); *Rice v. Comm'r of Soc. Sec.*, No. 12-CV-15690, 2014 WL 521045, at *8 (E.D. Mich. Feb. 10, 2014) (quoting *Dunnett v. Comm'r of Soc. Sec.*, No. 12-10930, 2013 WL 4604445, at *15 (E.D. Mich. Aug. 29, 2013)).  *See also Tommasetti v. Astrue*, 533 F.3d 1035, 1042 (9th Cir. 2008) ("Although the ALJ's step four determination constitutes error, it is harmless error in light of the ALJ's alternative finding at step five.").

### 3.    Transferability of Job Skills

Claimant argued that the ALJ's finding no. 9 related to transferability of job skills was in error again emphasizing that "dizziness" would prevent Claimant from safely working.  (DN 14, at PageID # 629.)  Because Claimant's argument is wholly dependent on and derivative of his arguments regarding the ALJ's assessment of his dizziness, which the undersigned rejected above, the undersigned likewise finds no error in the ALJ's finding no. 9.

### 4.    Step Five

Claimant also argued that the ALJ's finding No. 10 was in error because the hypothetical questions the ALJ posed to the VE did not accurately portray Claimant's impairments and, in particular, did not address his dizziness and balance limitations.  (DN 14, at PageID # 627-30.)  At step five, the ALJ has the burden of demonstrating that there exists a significant number of jobs in the national economy that the claimant can perform given his or her RFC, age, education, and past work experience.  20 C.F.R. § 404.1520(a)(4)(v), (g); 20 C.F.R. § 404.1560(c); *Jordan*, 548 F.3d at 423.  The Commissioner may meet this burden by relying on expert vocational testimony received during the hearing to determine what jobs exist in significant numbers in the economy that the claimant can perform considering the combination of his or her limitations.  *See, e.g.*, *Fry*

*v. Comm'r of Soc. Sec.*, 476 F. App'x 73, 76 (6th Cir. 2012); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004).  But a VE's testimony can constitute substantial evidence to support the Commissioner's finding that a claimant is capable of performing a significant number of jobs existing in the economy, *Bradford v. Sec'y Dep't. of Health & Hum. Servs.*, 803 F.2d 871, 874 (6th Cir. 1986) (per curiam), only so long as the VE's testimony is based on a hypothetical question that "accurately portrays [a claimant's] individual physical and mental impairments."  *Varley v. Sec'y of Health & Hum. Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)).  *See also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996).  "However, the ALJ is only required to incorporate into the hypothetical questions those limitations which have been accepted as credible."  *Hare v. Comm'r of Soc. Sec.*, 37 F. App'x 773, 776 (6th Cir. 2002); *see also Stanley v. Sec'y of Health & Hum. Servs.,* 39 F.3d 115, 118-19 (6th Cir. 1994) ("[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals.").  The undersigned has already found above the that ALJ's determination of Claimant's RFC was supported by substantial evidence.  Thus, the ALJ was not required to include additional limitations related to balance and dizziness in his hypothetical to the VE, and the VE's testimony constitutes substantial evidence to support his step five determination.

Accordingly, the undersigned finds that Claimant has failed to demonstrate any reversible error in the ALJ's step five analysis.

## III.  RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that the final decision of the

Commissioner be **AFFIRMED**.

Colin H Lindsay, Magistrate Judge

United States District Court

cc:  Counsel of Record

June 7, 2023

## <u>Notice</u>

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations.  A copy shall forthwith be electronically transmitted or mailed to all Parties.  28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after being served, a party may serve and file specific written objections to these findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal.  *Id.; United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985).